Date signed March 31, 2010



PAUL MANNES
U. S. BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| MILE 4 AUTOMOTIVE, INC. | : | Case No. 08-13622PM |
| | : | Chapter 7 |
|     Debtor | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | : | |
| Steven H. Greenfeld, Trustee of the | : | |
| Estate of MILE 4 AUTOMOTIVE, INC. | : | |
|     Plaintiff & Counter-Defendant | : | |
| | : | |
| vs. | : | Adversary No. 09-00080PM |
| | : | |
| OCEAN PETROLEUM, LLC | : | |
|     Defendant & Counterclaimant | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | : | |

### MEMORANDUM OF DECISION

      This matter came before the court for trial of the Complaint filed by Mile 4 Automotive, Inc. ("Debtor") against Ocean Petroleum, LLC ("Defendant"). Debtor filed this case under Chapter 11 on March 15, 2008. On the motion of the United States Trustee, it was converted to a case under Chapter 7 by an order entered November 19, 2008. This adversary proceeding was filed by the Debtor on February 10, 2009, after conversion of the case. Because of the lack of standing of the Chapter 7 Debtor to maintain this action, the Chapter 7 Trustee, Stephen H. Greenfeld, was substituted as Plaintiff. The Trustee then moved to employ Debtor's counsel, Charles Iweanoge as special counsel for the purpose of prosecuting this adversary proceeding.

1

The Complaint was pleaded in four counts -- breach of contract, fraud, unjust enrichment, and accounting.  Defendant filed a motion to dismiss the latter three counts and, in addition, filed an Answer to the breach of contract count as well as a counterclaim for breach of contract and conversion.  By order entered June 16, 2009, the court dismissed Debtor's fraud, unjust enrichment, and accounting claims [D.E. No. 24].  Debtor later filed a motion to dismiss the counterclaim or, in the alternative, for summary judgment, which motion was denied.  As a result, the only remaining matters before the court are the parties' respective breach of contract claims and Defendant's conversion claim.

I.      **Factual Background**

On June 9, 2005, Debtor and Defendant entered into a sale and supply agreement (the "Contract") [Def. Ex. 2], that governed the Plaintiff's purchase of the premises known as 315 Smallwood Drive, Waldorf, Maryland (the "Gas Station"), and the purchase of gasoline, diesel fuel and related items from Defendant.  The facility consisted of  four islands, three mechanics' service bays, a U-Haul franchise, and a convenience store.  Pursuant to section 1(a) of the Contract, Debtor agreed to purchase a minimum of 75,000 gallons of gasoline per month and 3,000 gallons of diesel fuel per month for a ten year term from June 9, 2005, to June 9, 2015.  The Contract was signed by Jennifer Ingle, a dealer representative of Defendant, and Paul Ajayi, President of Debtor.  Mr. Ajayi also signed the Contract as a personal guarantor.

On January 13, 2006, Plaintiff closed on its purchase of the Gas Station.  The financing for the purchase of the Gas Station was obtained through a Small Business Administration guaranteed loan in the amount of $805,000 from Main Street Lenders, LLC ("Main Street").  Prior to closing, Defendant obtained a quote regarding the machinery and equipment to be purchased for installation at the Gas Station (the "Quote") [Def. Ex. 7].  Based upon this quote the settlement agent, Lerch, Early & Brewer, Chtd. ("Lerch"), withheld the sum of $60,615 in escrow [Pl. Ex. 1].  Shortly thereafter, on February 8, 2006, Defendant submitted an invoice dated January 24, 2006 to Lerch [Pl. Ex. 3], requesting payment of $60,615.00.  Lerch paid the full amount by check dated January 17, 2006 and Defendant deposited this check on February 13, 2006 [Pl. Ex. 4].

Over the course of the next several months, Defendant purchased some, but not all, of the equipment listed on the Quote.  Specifically, Defendant purchased and installed four fuel

2

dispensers and the related hanging hardware for a total amount of $39,324.37 [Def. Ex. 10]. In addition, for $705.00, Defendant purchased a piece of equipment that would allow the fuel pumps to communicate with the point of sale ("POS") payment system to be set up at the Gas Station.[1] Defendant also spent approximately $523.00 to store the equipment prior to installation. Of the equipment listed on the Quote, Defendant did not purchase the GSite, the tank monitor, or the ISO relay leak detector [D.E. No. 53, Transcript of Hearing held October 7, 2009 (hereinafter "Trial Transcript"), 27]. Per the Quote, the labor costs associated with the installation of the dispensers were estimated to be $3,000. Due to unforeseen labor costs associated with upgrading the existing infrastructure, actual labor charges were significantly higher than the estimate [Def. Ex. 23, Transcript of Deposition of Steve Ladd (hereinafter "Ladd Deposition"), 44-47]. Defendant asserts, and Debtor does not appear to dispute that, of the $60,615 received by Defendant from Lerch, Defendant spent $54,312 on equipment and labor, leaving $6,302.00 unspent. These funds were retained by Defendant.

The Contract provided for the rebranding of the Gas Station to a Texaco Station. Ms. Ingle testified at trial that, apart from costs incurred "if the seller loses the right to use the trademark materials," the Debtor was to bear the cost of the rebranding expenses [Trial Transcript, 102-103]. Defendant's role with respect to rebranding was to provide the necessary equipment, as set forth in Paragraph 22 of the Contract.

After closing but before rebranding efforts commenced, the Gas Station was operated as an unbranded station. Debtor purchased fuel from Defendant [Trial Transcript, 30; Pl. Ex. 12]. The parties dispute the timeline regarding when the rebranding of the Gas Station was to occur [Trial Transcript, 104]. In any event, Defendant received permission from Chevron (not Texaco, as specified in the Contract)[2] to rebrand the Gas Station to a Chevron facility on March 28, 2006

---

[1] Pursuant to Paragraph 8(c) of the Contract, all credit cards sales at the Gas Station were to be made through the POS system and Debtor agreed to "lease a [POS] machine, satellite dish, and other related equipment from Seller during the initial term and any renewal of this Contract, the rent for which shall be the same as the rental fee and other network and service fees charged Seller by Supplier, which payment shall be due and payable by Electronic Fund Transfer on the first day of each month."

[2] Mr. Ajayi testified at trial that he agreed to have the Gas Station branded as a Chevron, rather than a Texaco, station upon recommendation of Ms. Ingle. Notwithstanding language in the Contract that requires any modifications to be in writing, the parties never executed an

[Def. Ex. 14].  The process of rebranding the Gas Station that necessitated the removal of the existing dispensers and installation of the new dispensers and related equipment, began in June 2006.  During this process, for a period of approximately 15 days, Debtor could not sell petroleum products (but continued to operate the convenience store, mechanics' bays, and U-Haul business).  The parties agree that the rebranding work was substantially completed on or about July 6, 2006.    This work included installation of Chevron signage and trade dress at the Gas Station, repair of the Gas Station's canopy, and cleaning of the Gas Station.  Defendant is said to have spent $43,323.81 on these rebranding efforts [Def. Ex. 17]. The intention was that these image item costs would be covered by and incentive payment of two cents a gallon on purchases from Chevron, provided that Debtor bought the fuel [Ladd Deposition, 43].

      Certain government-mandated environmental tests had to be conducted of the underground storage tanks at the Gas Station before the Gas Station could be opened under the Chevron name. In order to perform these tests, one of the underground mid-grade gasoline tanks had to be converted to diesel fuel storage.  Debtor asserts that the mid-grade gasoline was pumped out and that Defendant never gave it a credit for removed gasoline [D.E. No. 57, Debtor's Post-Trial Memorandum (hereinafter "Debtor's Memorandum"), 4-5]. Defendant claims that the gasoline was merely moved to another tank [D.E. No. 58, Defendant's Post-Trial Memorandum (hereinafter "Defendant's Memorandum"), 13]. The court finds that Debtor did not sustain its burden of proof as to this claim.

      On July 7, 2006, Defendant delivered 8,400 gallons of Chevron branded gasoline and 4,999 gallons of Chevron branded diesel fuel (the "Deliveries") [Pl. Ex. 5 & 6].  The charges for the Deliveries were $25,848.30 and $14,040.69, respectively.  According to Defendant, Mr. Ajayi gave verbal authorization for the Deliveries during a conversation with Defendant's retail operation manager, Don Santiago.  During this conversation, Mr. Ajayi was informed that more fuel was needed for the environmental tests, and according to Defendant, "stated that [Defendant] should order the fuel necessary for the tests as soon as possible." [Defendant's Memorandum, 14].  Furthermore, Defendant asserts that these deliveries were authorized by

---

addendum or a different agreement [Trial Transcript, 23, 119].  According to Defendant's counsel, "[b]oth parties treated this at all times as a Texaco/Chevron agreement.  In fact, Texaco/Chevron is quite often called Texaco Chevron or Chevron Texaco, because they are the same company" [Trial Transcript, 88].

4

Paragraph 20 ("Environmental Compliance") of the Contract, which sets forth the parties' obligations with respect to the testing of the underground storage tanks. Debtor, however, contends that the Deliveries were made without Debtor's consent. At trial, Mr. Ajayi testified that "[t]hey did not communicate with me how much gas is needed and when they need the gas. One of them went ahead and ordered the gas, a full load of diesel, and gasoline. . . . And gasoline was much more than we normally and originally ordered. And the diesel that was ordered, there was about 5,000 gallons. We realized, even according to this contract, we should have no more than 3,000 gallons to start with for every month. But they order way in excess of what is needed. And then they demanded that they needed the money the second day" [Trial Transcript, 30-31]. The court finds nothing in Paragraph 20 of the Contract that authorizes Defendant to ship unordered fuel to the Debtor.

      Debtor did not have sufficient funds to pay for the Deliveries in full upon receipt. Pursuant to the Contract, Debtor agreed to "pay by means of electronic funds transfer, or other means agreed to by the parties, no later than the day following delivery for all goods delivered." The parties eventually agreed to extend the payment deadline to July 28, 2006 and, according to Debtor, it was able to pay off the total amount due for the fuel delivery ($25,848.30) within thirty days [Debtor's Memorandum, 6]. Due to Debtor's inability to pay for the Deliveries in full by the agreed upon date, however, Defendant refused to make further fuel deliveries to the Debtor. Debtor asserts that, due to its lack of supply, it stopped selling gasoline products in August 2006 [Trial Transcript, 79]. Mr. Ajayi testified that he spoke with Ms. Ingle and Mr. Santiago, as well as the CEO of Defendant, about purchasing gas elsewhere but that they advised him that doing so would violate the Contract [Trial Transcript, 33-34].

      In time, a Chevron representative visited the Gas Station shortly after operations commenced under the branded name to ensure that the station met Chevron standards. The representative found that the Gas Station was not operating, and Chevron refused to make any of the two cent incentive payments to Defendant. Mr. Ajayi testified that the Gas Station continued to sell diesel fuel until June 28, 2007 [Trial Transcript, 43] but that Debtor's inability to sell gasoline adversely affected the other businesses Debtor was operating at the Gas Station [Trial Transcript, 63-65]. The Gas Station became, in Mr. Ajayi's words, a "ghost town." [Trial Transcript, 68]. Ajayi testified that Main Street attempted to assist Debtor with purchasing the equipment needed to make the Gas Station operational again but that those attempts proved

5

unsuccessful [Trial Transcript, 45, 76]. During this period, all credit card purchases from Debtor's business were credited to an account controlled by Defendant and Chevron [Trial Transcript, 40]. Debtor asserts that, on or about July 2, 2007, an agent of the Defendant removed equipment from the Gas Station. According to Mr. Ajayi, Defendant removed "[e]verything that has to do with sale of gasoline in [the Gas Station] other than the pump[.]" [Trial Transcipt, 43]. As a result of this action, Debtor was unable to generate sufficient revenue to meet its financial obligations, which led to eventual foreclosure by Main Street and Debtor's filing for bankruptcy [Trial Transcript, 40] .

Defendant delivered a written Notice of Termination (the "Notice") [Pl. Ex. 11] to Debtor on October 5, 2007, stating the grounds for termination as follows "(i) failure of [Debtor] to operate the marketing premises for seven (7) consecutive days, 15 U.S.C. §§ 2802(b)(2)(C) and 2802(c)(9); (ii) [Debtor's] failure to pay [Defendant] in a timely manner when due all sums to which [Defendant] is legally entitled, 15 U.S.C. §§ 2802(b)(2)(C) and 2802(c)(8); and (iii) failure of [Debtor] to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, 15 U.S.C. § 2802(b)(2)(A)." After delivery of the Notice, Defendant attempted to remove the Chevron trade dress and signage from the Gas Station but was prohibited from doing so by local authorities.

## II.  The Parties' Claims

The Debtor asserts that Defendant breached the Contract when it 1) failed to purchase and install the equipment after it presented an invoice and was paid in full prior to any work in connection with the Gas Station being performed, and 2) refused to supply gasoline products. The Debtor seeks a judgment in the amount of $292,624.97, which is comprised of damages in the amount of $18,495 (i.e., the amount remaining in escrow less the amount of the estimated costs of the equipment actually purchased and installed), $270,000 in lost profits and $4,129.97 for the 1,300 gallons of gasoline allegedly removed from the station during the state-mandated environmental testing.

The grounds for Defendant's breach of contract claim are set forth in the Notice, as recited above. Defendant also asserts a claim for conversion in the amount of $13,448.27, based upon Debtor's retention of Chevron trade dress and signage. It should be noted that, in its post-trial memorandum, Defendant states that it "plead the conversion count as an alternative to the

breach of contract count. The value of the converted property is included in the rebranding costs and therefore included in the calculation of Ocean Petroleum's breach of contract damages." [25, n.11]. Defendant asserts that it is entitled to compensatory damages "to recover both the reasonably foreseeable damages in the contemplation of the parties at the time the Contract was executed and [Defendant's] expenditures in reliance on the Contract, namely the costs of rebranding the Gas Station to a Chevron branded station." [Defendant's Memorandum, 23]. Alternatively, Defendant asserts that it is entitled to liquidated damages in the amount of $93,466.01 due to Debtor's early termination of the Contract. According to Defendant, the total amount due from Debtor to Defendant under the Contract is $136,100.82, which is comprised of a fuel account balance of $5,613.31 [Def. Ex. 18], rebranding expenses in the amount of $43,323.81, and damages in the amount of $93,446.01, less the surplus in Debtor's equipment account ($6,302.31). Defendant is not entitled to an affirmative judgment on the Counterclaim but could set off any recovery against Debtor's claim.

### *A. The Breach of Contract Claims*

Under Maryland law, the elements for a breach of contract claims are 1) the existence of a contractual obligation owed, and 2) a material breach of that obligation. *Taylor v. NationsBank*, *N.A.*, 776 A.2d 645, 651 (Md. 2001). Neither party argued that the substitution of Chevron for Texaco nullified the Contract and therefore the court finds, as a preliminary matter, that the Contract is a valid and enforceable agreement between the parties. Turning to the second element for a breach of contract claim, the court must first determine whether the Contract was breached by Debtor's failure to pay for the Deliveries or, alternatively, by Defendant's failure to supply gas products after July 7, 2006. If the former, the Debtor will not be able to prevail on its breach of contract claim inasmuch as the failure of performance by one party suspends the duty of the other party to perform. *Bollech v. Charles County, Md.*, 166 F. Supp. 2d 443, 458 (D. Md. 2001) (citing *Wilcom v. Wilcom*, 502 A.2d 1076, 1081 (Md. App. 1986)). *See also* RESTATEMENT (2nd) OF CONTRACTS, § 237, *Effect on Other Party's Duties of a Failure to Render Performance* (1981). In making this determination, the court looked to the relevant provisions of the Contract, namely:

    4. Price.

> The price of the product(s) covered by this Contract shall be as stated in the applicable Commodity Schedule(s); attached and made part of this Contract. [Debtor] agrees to pay by means of electronic funds transfer, or other means agreed to by the parties, no later than the day following delivery for all goods delivered to [Debtor] by [Defendant] under the terms of this Contract except deliveries for which credit has been previously arranged in writing with [Defendant]. Payment shall be made at the time or, or by the day following delivery. Purchases made and not paid for on, or by the day following, delivery shall be payable at [Defendant's] principal office unless otherwise specified by [Defendant].
>
>    * * * * * * *
>
> 7. <u>Credit.</u>
>
> Credit shall be extended to [Debtor] for motor fuel deliveries pursuant to the terms provided in paragraph 4, subject to the additional terms and conditions of this paragraph 7.
>
>    * * * * * * *
>
> (c) In the event there are additional business transactions between [Debtor] and [Defendant] including without limitation those relating to credit sales of products other than those identified herein, promissory notes, or real estate, unless it is clearly indicated in writing by [Debtor] as to how payments received by [Defendant] from [Debtor] are to be applied, then such payments shall be applied by [Defendant] in the following order of priority: (I) trade accounts, (ii), promissory notes, (iii) rentals or other amounts due under any other agreements or transactions.
>
>    * * * * * * *
>
> (e) [Defendant] shall have the right but not the obligation to offset any indebtedness owed by [Defendant] to [Debtor] against any indebtedness owed by [Debtor] to [Defendant], whether arising from the sale of goods or product(s) under this Contract, or from any other business transaction described in Paragraph 7(c) above.

  It is not disputed that Debtor failed to pay for the Deliveries the day that they were made or the day thereafter. Debtor puts forth several arguments as to why, in spite of its failure to pay in a timely manner, it did not breach the Contract. In its post-trial memorandum, Debtor argues with considerable merit that, pursuant to an implied covenant of good faith, Defendant should have treated the remaining portion of the escrowed funds ($18,495.00) as a pre-payment and offset the cost of the diesel fuel delivery ($14,040.69) against those funds [10]. In its post-trial

reply brief, Debtor argues: "There is nothing in paragraph 4 or any other paragraphs that time is of the essence or that delivery would be stopped until payment was received in full. The contract to the contrary provides in paragraph 7 that credit shall be extended to [Debtor] when payment is not made on or before the due date" [D.E. No. 59, 1].

The court is not convinced by any of the arguments set forth by the Debtor, each of which are at odds with the express language of the Contract. "'[W]hen the language of a contract is plain and unambiguous, there is no room for construction, and a court must presume that the parties meant what they expressed ... Consequently, the clear and unambiguous language of an agreement will not give [way] to what the parties thought that the agreement meant or intended it to mean.'" *Bollech*, 166 F. Supp. 2d. at 455 (quoting *General Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (Md. 1985)). *See also Strickler Eng'g Corp. v. Seminar, Inc.*, 122 A.2d 563, 568 (Md. 1956) ("Where parties have expressed their intention in clear and definite terms the paper must be construed according to the true meaning of the words used therein.").

As to the first argument, the court finds that Paragraph 7(e) of the Contract clearly states that Defendant was not required to offset the amount owed by Debtor for the Deliveries against the remaining escrowed funds. The implied covenant of good faith cannot override explicit contract terms. *Riggs Nat'l Bank of Washington, D.C. v. Linch*, 36 F.3d 370, 373 (CA4 1997). In any event, Maryland does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing. *Eaglehead Corp. v. Cambridge Capital Group, Inc.*, 170 F. Supp. 2d 552, 561 (D. Md. 2001). *See Blondell v. Littlepage*, __A.2d__, 2010 WL 937267 *9 (Md. March 17, 2010). As to the second argument, the court believes that Debtor has misconstrued the express terms of the Contract. While it is true that the Contract does not state that "time is of the essence" with respect to Debtor's payment obligations, under Maryland law, a buyer's failure to pay is deemed a material breach. *Sagent Tech., Inc. v. Micros Sys., Inc.*, 276 F. Supp. 2d 464, 469 (D. Md. 2003). Moreover, pursuant to Paragraph 25 of the Contract, "any breach of a provision by either party hereto or a failure to carry out said provisions in good faith shall conclusively be deemed to be substantial." Debtor's interpretation of Paragraph 7 is problematic as well - the Contract does not state that credit will be extended when Debtor does not pay in a timely fashion but rather explains how credit will be extended if Debtor has made a previous credit arrangement in writing with Defendant. Debtor has not presented any evidence

9

that the parties had, prior to July 7, 2006, entered into a written credit arrangement.  Based on the foregoing, the court finds that Debtor's failure to pay for the Deliveries in full within the time required by the Contract (or to do so within the extensions agreed upon by the parties) was a breach of that agreement.  Defendant therefore did not breach the Contract by subsequently refusing to make any future gasoline deliveries because it no longer had an obligation to perform under the Contract. *See Bollech*, *supra*.

Having concluded that Defendant was entitled by its contract of adhesion to do exactly what it did here, the court is nonetheless appalled by its actions.  It led this Debtor down the primrose path and the Debtor's failure could have been avoided had Defendant simply applied the funds held in escrow to the amount still owed by the Debtor for the Deliveries.  One would think that this course of conduct would have been followed here, particularly in view of the fact that the Debtor's default was the direct result of Defendant's dumping unneeded fuel on it. The court is puzzled why the Defendant held this Debtor on such a short leash. But, in the final analysis, given the terms of the contract between the parties, Defendant had the right to act precisely as it did.

Because this is a "no asset" case, there will be no dividend to holders of unsecured claims such as Defendant.  All Defendant accomplishes by filing the Counterclaim would be to offset it against any recovery by the Debtor.  Therefore, its Counterclaim is moot.

An appropriate order will be entered.

cc:

Charles C. Iweanoge, Esq., 1026 Monroe Street, NE, Washington, DC 20017
Alan M. Grochal, Esq., 100 East Pratt Street, Floor #26, Baltimore, MD 21202
Steven H. Greenfeld, Esq., Trustee, 7910 Woodmont Avenue, #1103, Bethesda, MD 20814